# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARY E. PRICE** | : | **CIVIL ACTION** |
| *Plaintiff, pro se* | : | |
| | : | **NO. 19-1590** |
| **v.** | : | |
| | : | |
| **COMMONWEALTH CHARTER ACADEMY - CYBER** | : | |
| | : | |
| *Defendant* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                                 MARCH 24, 2020

## MEMORANDUM OPINION

**INTRODUCTION**

Plaintiff Mary E. Price, in her own right, as the parent of minor T.R. and the former legal guardian of J.H., commenced this action against Defendant Commonwealth Charter Academy ("CCA"), asserting claims under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*,[1] and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, seeking enforcement of a hearing officer's administrative decision that granted compensatory education awards to T.R. and J.H. [ECF 2]. Before this Court is CCA's motion to dismiss all claims against it, filed pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), for failure to state a claim upon which relief can be granted. [ECF 6]. Plaintiff filed a response in opposition to the dismissal of the claims related to T.R.[2] [ECF 8]. The issues presented in the motion to

---

[1] The IDEA was amended and renamed the Individuals with Disabilities Education Improvement Act (the "Act"), effective July 1, 2005. *See* Pub. L. No. 108-446, 118 Stat. 2715 (2005). Notwithstanding this change in the name of the statute, courts and litigants, including the parties in this action, continue to refer to this statute as the IDEA. *See, e.g., H.E. v. Walter D. Palmer Leadership Learning Partners Charter Sch.*, 873 F.3d 406, 408 (3d Cir. 2017). For purposes of clarity and consistency, this Court will refer to the Act as the IDEA in this Memorandum Opinion.

[2] In its motion to dismiss, CCA argued grounds applicable *only* to J.H. Specifically, CCA argued that Plaintiff lacks standing to pursue relief for J.H.'s behalf because on July 20, 2019, .J.H. executed a

dismiss have been fully briefed and are ripe for disposition. For the reasons stated herein, CCA's motion to dismiss is granted.

**BACKGROUND**

When ruling on a motion to dismiss, this Court must accept as true all the factual allegations in Plaintiff's complaint and construe the complaint in the light most favorable to the Plaintiff. *Fowler v. UMPC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)). The relevant allegations in Plaintiff's complaint and the attached exhibits are summarized as follows:[3]

> Plaintiff Mary E. Price is the mother of minor T.R., who is a student at CCA. At all relevant times, CCA was, and continues to be, T.R.'s local education agency ("LEA"). T.R. is diagnosed with multiple mental disabilities that affect T.R.'s learning.
>
> In February 2016, Plaintiff filed a special education due process complaint alleging that CCA had denied T.R. a free appropriate public education ("FAPE") in the 2013-2014, 2014-2015, and 2015-2016 school years. In September 2016, following an administrative hearing, Hearing Officer Charles W. Jelley (the "Hearing Officer") found that CCA had denied T.R. a FAPE. As relief, the Hearing Officer granted T.R. a compensatory education award ("CEA") of 940 hours per year for three school years, to provide "the equitable remedy of specific performance of the LEA's past FAPE duties." Compl. Ex. at p. 50 (ECF 2-1). The Hearing Officer's Order ("Order") provided that Plaintiff could select a third-party service provider to deliver the compensatory education services and for CCA to reimburse the provider for the services provided. Any provider selected would be required to provide Plaintiff with four progress reports each year.
>
> On January 21, 2019, Plaintiff notified CCA that she had selected Fusion Academy ("Fusion"), a private school, as the provider and that she wished for T.R. to attend school at Fusion while still remaining enrolled at CCA and for CCA to

---

durable power of attorney giving J.H.'s biological mother that right. In acknowledgment of her lack of standing, Plaintiff voluntarily "withdrew" all claims against CCA as they pertain to J.H.

[3] When ruling on a Rule 12(b)(6) motion to dismiss, a court may consider, in addition to the facts alleged in the complaint, any exhibits attached to the complaint. *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (citing *Pryor v. NCAA*, 288 F.3d 548, 559 (3d Cir. 2002)).

continue as T.R.'s LEA.[4] Accordingly, on January 28, 2019, CCA contacted Fusion by letter requesting information about Fusion's services, including the school day hours, number of school days in a calendar year, and tuition cost. CCA also requested that Fusion provide CCA with future reports regarding T.R.'s attendance and academic progress, noting that this request was specifically made because Plaintiff wanted T.R. to remain enrolled at CCA and for CCA to remain T.R.'s LEA while T.R. attended Fusion. CCA indicated that once it received such information, Fusion could bill CCA directly for T.R.'s tuition. CCA forwarded Plaintiff a copy of the letter on January 29, 2019 and a signed copy on January 31, 2019.[5]

On February 8, 2019, Fusion reported to Plaintiff that it was "actively in contact with CCA to make sure [it] cover[s] all [its] bases to make sure everything is covered[.]" Compl. Ex. at p. 146 (ECF 2-1). CCA e-mailed Plaintiff on February 12, 2019 updating her that there was one outstanding piece of information that Fusion had not yet provided (*i.e.*, how long Fusion's "sessions" last) that CCA required to calculate the correct number of hours used from the CEA. On February 15, 2019, Fusion e-mailed Plaintiff to advise that it had a written agreement from CCA and wanted to schedule a time with Plaintiff to review the revised enrollment contract for T.R.

On March 1, 2019, Fusion informed Plaintiff that it has a policy of requiring parents or guardians to place a credit card or bank account on file with Fusion to cover any costs that arise. Plaintiff reminded Fusion that CCA was the party responsible for the payment of T.R.'s tuition, refused to provide credit card or bank information, and wrote: "In any event, if Fusion is unable to move forward without my payment information in its MyBill account, then [T.R.] will not start at Fusion unless, and until, all matters pertaining to funding are resolved in writing." Compl. Ex. at p. 173-74 (ECF 2-1). Fusion reached out to CCA seeking a credit card to keep on file and CCA replied that it could not do so because the card was for a public school, rather than for particular students. In the past, when T.R. was receiving services from a different provider, CCA had provided a credit card to the provider to keep on file.

On March 3, 2019, Plaintiff e-mailed Fusion that "[it] will delay [T.R.'s] start date to allow time for Fusion to get CCA's financial obligation clearly stated in writing[.]" Compl. Ex. at p. 179 (ECF 2-1). On March 6, 2019, Fusion e-mailed Plaintiff writing that it re-sent billing information to CCA and once it heard back

---

[4] Prior to this date, with the exception of a few weeks between February and March 2019, T.R. received services from a different third-party provider that Plaintiff had selected and CCA had approved.

[5] Plaintiff alleges that she did not timely read or receive several of the e-mails sent to her during January and February of 2019 for two reasons: (1) some e-mails were sent to Plaintiff's official CCA e-mail address, which she did not check or did not check as frequently as her Gmail account, and (2) that several e-mails appeared in her official CCA e-mail account in a delayed manner inconsistent with their automated timestamps.

from CCA, T.R. would be able to start at Fusion. Plaintiff contends that as a result of this payment-method-on-file dispute, T.R. was unable to begin classes at Fusion by March 4, 2019, which was the date Plaintiff and Fusion had originally planned as the enrollment date.

On March 12, 2019, Fusion sent both CCA and Plaintiff an e-mail with an invoice for T.R. advising that, once T.R. began classes, it would e-mail attendance and progress reports to CCA every two weeks. Plaintiff took issue with Fusion's representation that it would send CCA progress reports and informed CCA and Fusion that she believed CCA was not entitled to receive progress reports of any kind or frequency pursuant to the Hearing Officer's Order. CCA insisted on receiving progress reports.

On March 14, 2019, Fusion e-mailed Plaintiff indicating that it had a binding agreement with CCA to pay for T.R.'s tuition, and T.R. could begin classes on March 18, 2019. That same day, CCA e-mailed Plaintiff confirming that all parties had agreed to March 18, 2019 as a start date, and again indicated that it had communicated its payment commitment to Fusion and that Fusion "honors [its] request for attendance and progress reports, necessary documentation for funds dispersed." Compl. Ex. at p. 195 (ECF 2-1). Plaintiff responded that she would "not allow CCA to unilaterally place conditions on the third-party provider, Fusion Academy, for progress reports, or any other requests, that are contrary to the [CEAs]." Compl. Ex. at p. 196 (ECF 2-1). In response, CCA indicated that it has the authority and responsibility, as a public school, to verify the propriety of the disbursement of public funds through appropriate documentation, and that Fusion had no objection to providing progress reports to CCA; and that T.R.'s Individualized Education Plan ("IEP") was only limited, if at all, "by [Plaintiff's] unwillingness to allow CCA to assess for baseline(s) and [her] determination to not allow CCA to progress monitor." Compl. Ex. at p. 198 (ECF 2-1). CCA reiterated its agreement to the March 18, 2019 start date. Plaintiff again voiced her objection to CCA receiving reports, and referred to the March 18, 2019 start date as "tentative."

On Monday, March 18, 2019, Fusion e-mailed Plaintiff indicating that it was excited for T.R. to start at Fusion the next day. In reply, Plaintiff wrote that T.R. would not be starting on March 19, 2019 unless she received "written confirmation that CCA has rescinded the requirement for Fusion to agree to provide progress reports[.]". Compl. Ex. at p. 201 (ECF 2-1). Minutes later, CCA responded to Plaintiff's renewed objection indicating that the reports Fusion provides must confirm that T.R. is benefiting from the educational services provided; and that it was "willing to continue to work with [Plaintiff] on the frequency and detail of reports that Fusion will provide to CCA, but [it] must insist that the reports be provided directly to CCA every two weeks until [they] come to an alternate agreement." Compl. Ex. at p. 202 (ECF 2-1). CCA noted that it agreed to another revised start date of March 19, 2019 in light of the e-mails that had continued between the parties over the previous weekend. Plaintiff replied to CCA,

4

as she had to Fusion, that T.R. would not begin classes on March 19, 2019 if she did not get "written confirmation that CCA has rescinded the requirement for Fusion to agree to provide progress reports[.]" Compl. Ex. at p. 210 (ECF 2-1).

Later in the afternoon on March 18, 2019, Fusion requested additional written assurance from CCA, in addition to the e-mails already received, certifying CCA's commitment to payment for T.R. and sent a contract to that effect. As of March 20, 2019, CCA had not signed the contract. Plaintiff contends that as a result of CCA not signing this contract, T.R. was unable to begin classes at Fusion on March 19, 2019.

On March 21, 2019, CCA e-mailed Plaintiff, *inter alia*: "You [(Plaintiff)] have requested that [T.R.'s] participation in and completion of certain courses through Fusion fulfill the requirements that would apply for the same courses through CCA and with the student[] remaining enrolled at CCA, but not engaging fully in CCA's on-line school. This situation is different from a situation where compensatory education hours are used to supplement a student's daily school attendance. Therefore, CCA must regularly receive information about [T.R.'s] progress in these courses." Compl. Ex. at p. 214 (ECF 2-1). CCA also indicated that it agreed to yet another revised start date of March 25, 2019.

On March 22, 2019, Plaintiff e-mailed CCA, and copied Fusion on the e-mail, indicating that the parties had "hit an impasse" regarding the terms of the CEA and that she would be filing a civil action seeking enforcement of the Hearing Officer's decision. Compl. Ex. at p. 216 (ECF 2-1). Plaintiff commenced this civil action on April 12, 2019.

**LEGAL STANDARD OF REVIEW**

Rule 12(b)(6) permits a court to grant a motion to dismiss an action if the complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion, a court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler*, 578 F.3d at 210-11 (citing *Iqbal*, 556 U.S. at 677). The court must determine whether the plaintiff has pled facts sufficient to show a plausible entitlement to relief. *Fowler*, 578 F.3d at 211. The complaint must do more than merely allege a plaintiff's entitlement to relief—it must "show such an entitlement with its facts." *Id.* (citations omitted). The plaintiff "must allege facts sufficient to 'nudge [his or her] claims across the line

5

from conceivable to plausible.'" *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. After construing the complaint in the light most favorable to the plaintiff, if the court finds that the plaintiff could not be entitled to relief, it can dismiss the claim. *Fowler*, 578 F.3d at 210.

Additionally, while *pro se* filings "must be held to less stringent standards than formal pleadings drafted by lawyers," such filings must still contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Fantone v. Latini*, 780 F.3d 184, 193 (3d Cir. 2015) (quoting *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) and *Iqbal*, 556 U.S. at 678).

**DISCUSSION**

As noted, CCA contends that Plaintiff fails to state a claim upon which relief can be granted. Specifically, CCA argues that Plaintiff's allegations, in the complaint and the exhibits attached thereto, demonstrate that CCA complied with the Hearing Officer's decision and Order to the extent possible. This Court agrees and will address each of Plaintiff's contentions separately.

*Count I: Enforcement of the Hearing Officer's Decision*

The IDEA grants "[a]ny party aggrieved by the findings and decision of the administrative proceedings to bring a civil action in state or federal court." *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 276 (3d Cir. 2014) (citing 20 U.S.C. § 1415(i)(2)) (internal quotations omitted). "[I]ndividuals seeking to enforce a favorable decision obtained at the administrative level are 'aggrieved' for purposes of the IDEA and may properly pursue such claims in court." *Id.* at 278. "The Third Circuit has definitively interpreted this provision to confer jurisdiction where . . . [a plaintiff alleges that] an LEA refuses to comply with a hearing officer's decision . . . ." *Lejune v.*

*Khepera Charter Sch.*, 327 F. Supp. 3d 785, 793 (E.D. Pa. Aug. 19, 2018) (citing *D.E.*, 765 F.3d at 278).

The relevant portions of the Hearing Officer's decision and Order are as follows:

> CCA denied T.R. a FAPE across three school years. CCA failed to fulfill its obligation to design and administer an IEP that was reasonably calculated to enable T.R. to receive meaningful educational benefits in light of his potential and his relevant disabilities, as evidenced by a "downward trend in performance" detailed extensively in the decision. Compl. Ex. at p. 46-49 (ECF 2-1). To remedy this past denial, the Hearing Officer ordered the equitable remedy of a compensatory education award (the Order "should[,] once achieved[,] remedy the LEA's . . . violations." *Id*. at 49.). The Order granted a CEA of 940 hours per year for three school years. The Order stated that Plaintiff could select a third-party service provider to deliver the compensatory education services and, thereby, "execute the equitable remedy of specific performance of the LEA's past FAPE duties." *Id.* at 50. CCA must pay the provider to provide these services. The provider can use the hours "to provide whatever specially-designed instruction, related services, assistive technology, supplemental services, and aids necessary to make [T.R.] whole." *Id.* at 51. The provider must give Plaintiff a progress report verifying T.R.'s progress four times a year. The Order further directed Plaintiff and CCA to meet as soon as possible and develop the IEP, consistent with the Hearing Officer's findings, for the school year that had just begun.

Pursuant to this Order, CCA is required to pay a provider selected by Plaintiff for "whatever specially-designed instruction, related services, assistive technology, supplemental services, and aids necessary to make [T.R.] whole." *Id.* at 51. Whatever services a provider renders in order to make T.R. whole must satisfy the requirements of T.R.'s IEP, which CCA and Plaintiff were to develop, in order to remedy CCA's past failure to provide a FAPE in accordance with an appropriate IEP.

Plaintiff contends that CCA has failed to comply with the Order because CCA continually imposed impermissible demands on the selected provider, Fusion, as a requirement for payment of T.R.'s tuition. Specifically, Plaintiff argues that CCA's insistence on receiving progress reports from Fusion is tantamount to imposing an additional requirement on the receipt of the CEA funds, and that CCA's refusal to pay Fusion without an agreement to receive progress reports violates the

7

Order.  In its motion to dismiss, CCA argues that it has continually agreed to pay T.R.'s tuition, and its requests for information regarding whatever sessions Fusion provides and T.R.'s progress in the program are not inconsistent with the Order; but, rather, said information is necessary for CCA to fulfill its legal obligation to provide T.R. with a FAPE.

In Pennsylvania, "charter schools are independent LEAs and 'assume the duty to ensure that a FAPE is available to a child with a disability in compliance with [the] IDEA and its implementing regulations.'  Under this scheme, [the LEA] bears full responsibility for providing special education services to students with disabilities." *R.B. v. Mastery Charter Sch.*, 762 F. Supp. 2d 745, 752-53 (E.D. Pa. Dec. 29, 2010) (quoting 22 Pa. Code § 711.3 and citing 34 C.F.R. § 300.209(c)).  This duty includes the obligation to develop and implement "an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017).  It is the LEA's obligation—not the parent's—to determine what resources are necessary to provide a child with a FAPE.  *Sch. Bd. of Indep. Sch. Dist. No. 11 v. Pachl*, 2002 U.S. Dist. LEXIS 23205 at *54 (D. Minn. May 10, 2002).  Further, "ensuring IEP development is an obligation essential to the delivery of a [FAPE] and . . . it is not a simple matter to disconnect the LEA from this obligation and still fulfill the objectives of the IDEA." *Millay v. Surry Sch. Dep't*, 2011 U.S. Dist. LEXIS 31048 at *29 (D. Me. March 23, 2011).

The purpose of a compensatory education award ("CEA") is "to make up for past failures on the part of the [LEA.]" *Ferren C. v. Sch. Dist. of Phila.*, 612 F.3d 712, 719 (3d Cir. 2010).  If a student was deprived of a FAPE and, by extension, an IEP, then "the student could only be fully compensated by [a CEA] that contains elements of a FAPE that she [or he] was previously denied." *Id.* at 720.  In other words, a CEA "must be reasonably tailored to address the education deficit

that resulted from the educational agency's failure to provide the student a FAPE." *Stapleton v. Penns Valley Area Sch. Dist.*, 2017 U.S. Dist. LEXIS 204143 at *18 (M.D. Pa. Dec. 12, 2017) (citing *C.G. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 290 (1st Cir. 2008)). Thus, the disbursement of CEA funds "must align with identified educational services the student did not receive from the school district for the period of time he or she was deprived a FAPE." *Id.* at 18. Allowing a LEA to refuse to accept responsibility for, and provide, an IEP, and instead simply fund a student's CEA "would undoubtedly further hamper [a student's] education and deprive [him or] her of [his or her] educational rights under the IDEA." *Ferren C.*, 612 F.3d at 719. Further, "[a CEA granted in] a period during which [a student] continues to be covered by the IDEA . . . interacts with the [LEA's] continuing obligation under the [IDEA] to provide [the student] with a FAPE for that year." *Doe v. E. Lyme Bd. of Educ.*, 262 F. Supp. 3d 11, 33 (D. Conn. June 29, 2017). An "IEP team certainly must monitor [a student's] progress and coordinate compensatory relief with his current IEP[.]" *Reid v. District of Columbia*, 401 F.3d 516, 527 (D.C. Cir. 2005).

"In an action to enforce a favorable administrative decision resulting from an impartial due process hearing, as is the case here, the district court is vested with the authority to 'formulate an appropriate remedy that would effectuate the purpose of the IDEA and the hearing officer's award." *Stapleton*, 2017 U.S. Dist. LEXIS 204143 at *15 (quoting *D.E.*, 765 F.3d at 273). Here, at the motion to dismiss stage, this Court must determine what the Hearing Officer's decision and Order called for and whether the facts alleged by Plaintiff demonstrate that CCA has failed to comply with, and/or give effect to, that decision. As previously noted, the Order requires CCA to pay a provider, selected by Plaintiff, for "whatever specially-designed instruction, related services, assistive technology, supplemental services, and aids necessary to make [T.R.] whole." Compl.

Ex. at p. 51 (ECF 2-1). Whatever services the selected provider renders must satisfy the requirements of T.R.'s IEP, which CCA and Plaintiff were to develop.

There is no dispute that CCA remained T.R.'s LEA, upon Plaintiff's specific request. As such, CCA had a continuing obligation and remained legally liable for providing T.R. a FAPE and developing and implementing his IEP. As noted, Plaintiff selected Fusion as a provider. Plaintiff's right to choose a provider, however, is not unbridled[6]—she must select a qualified provider that satisfies the requirements of the Order. As the entity legally responsible for providing T.R. with a FAPE, implementing T.R.'s IEP, and disbursing the CEA, CCA had not only the right, but the *obligation* to ensure that whatever services Fusion provided would (1) satisfy the requirements of T.R.'s current IEP,[7] (2) include "whatever specially-designed instruction, related services, assistive technology, supplemental services, and aids necessary to make [T.R.] whole[,]"[8] (3) be reasonably tailored to address the education deficit that resulted from its failure to provide T.R. a FAPE in past years,[9] and (4) align with the specific educational services T.R. did not receive from CCA when T.R. was previously deprived a FAPE.[10] In short, CCA is obligated to pay a *qualified* provider selected by Plaintiff. Thus, if Plaintiff selected an unqualified provider (one who did not meet the requirements set forth above), CCA is not obligated to dispense hours and money from T.R.'s CEA. *See Stapleton*, 2017 U.S. Dist. LEXIS 204143 at *24 (finding "the School District was justified in its ultimate refusal to comply with Plaintiffs' request for the disbursement of

---

[6] *See Millay*, 2011 U.S. Dist. LEXIS 31048 at *29-30 (noting that using a CEA to establish a pool of money from which a family can "draw upon when and how it sees fit . . . has little resemblance to an [IEP]").

[7] *Reid*, 401 F.3d at 527; *Doe*, 262 F. Supp. at 33.

[8] Compl. Ex. at p. 51 (ECF 2-1).

[9] *Stapleton*, 2017 U.S. Dist. LEXIS 204143 at *18.

[10] *Ferren C.*, 612 F.3d at 719; *Id.*

[CEA] funds, as the Hearing Officer's Decision did not grant Plaintiffs unencumbered access to unspecified compensatory education reserves to be used . . . for whatever [] purpose Plaintiffs saw fit."). It follows that CCA's obligation to pay a provider is inherently contingent on evidence that the prospective provider is qualified to provide services to T.R., specifically. Because CCA, as T.R.'s LEA, is vested with the responsibility of ensuring T.R. receives a FAPE, CCA is the entity that must be satisfied that a particular provider is qualified.[11,12] It is, therefore, entirely reasonable for CCA to have initially inquired about Fusion's academic program, school day hours, academic calendar, length of sessions, etc., and to review the proposed enrollment contract. This information was clearly necessary for CCA to determine whether Fusion was a qualified provider eligible to utilize T.R.'s CEA.

As noted, CCA's duty to provide a FAPE includes the obligation to develop and implement "an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. To determine whether an IEP is effective—whether the plan and services are helping T.R. progress in his education—CCA is required to monitor T.R.'s progress.[13] In many cases, a CEA is used to provide supplemental services to a student

---

[11] However, CCA could not unreasonably refuse to pay an objectively qualified provider; the Order does not confer discretion on CCA to choose the provider CCA finds to be the most suitable, rather CCA is required to pay any provider that is shown to be qualified.

[12] Plaintiff alleges that she vetted Fusion and concluded that Fusion was a suitable placement for T.R. While Plaintiff's belief that Fusion is a suitable provider is certainly important because Plaintiff is the party with the obligation to select the provider, her selection is not dispositive or final because Plaintiff is not the party who is legally responsible for ensuring that T.R. receives a FAPE and that the CEA is utilized in furtherance of T.R.'s IEP—that is CCA's responsibility. *See Pachl*, 2002 U.S. Dist. LEXIS 23205 at *54 (noting it is the LEA's obligation—not the parent's—to determine what resources are necessary to provide a FAPE).

[13] As explained by Judge P. Kevin Castel, "[c]ommon sense and experience teaches that services that may be valuable for, or even critical to, a child's educational achievement when provided in small to moderate amounts may become close to useless, or even burdensome, if provided in overwhelming quantity." *M.M. v. N.Y.C. Dep't of Educ.*, 2017 U.S. Dist. LEXIS 47812 at *23 (S.D.N.Y. March 30, 2017). What is beneficial for T.R. at one point in time may easily become useless or inhibitive after a matter of

while the student still regularly attends school at the LEA. In those cases, it is much easier for the LEA to observe the student's progress or lack thereof. In instances such as T.R.'s, where the student is receiving *all* educational instruction from a third-party provider on a full-time basis and the LEA has no actual contact with nor provides any services to the student, the LEA is forced to rely on other methods (since direct observation is unavailable) to monitor the student's progress, such as progress reports. Here, Plaintiff insisted that CCA remain T.R.'s LEA while T.R. received all educational instruction from Fusion. Consequently, CCA had both the right and the obligation to insist on receiving periodic progress and attendance reports from Fusion.[14] "To hold otherwise, would impose on CCA all the legal liabilities and burdens of serving as the LEA for TR [ ], while denying CCA a reasonable amount of information necessary for CCA to satisfy its legal duties." Def. Br. at 7 (ECF 6-2). Without the requested reports, CCA would have no way of knowing whether T.R. was attending school, whether T.R. was improving or regressing academically and emotionally, whether certain services or methods of instruction were proving beneficial, etc. Further, without such knowledge, CCA could not ascertain whether T.R.'s IEP was being properly

---

months or years. Thus, CCA must monitor T.R.'s progress to ensure that he is continuously being provided with appropriate services.

[14] Plaintiff repeatedly makes the argument that the Order only granted *her* the right to receive progress reports and, thus, CCA has no right to receive them. Plaintiff's interpretation of the Order is overly restrictive. While it is true that the Order expressly granted Plaintiff the right to receive progress reports from Fusion four times a year, nothing in the Order suggests that the Hearing Officer intended to grant her the *exclusive* right to progress reports. To the contrary, interpreting the Hearing Officer's decision in a manner that effectuates the purposes of the IDEA (as this Court is required to do (*D.E.*, 765 F.3d at 273)), the affirmative grant of the right to receive progress reports to Plaintiff cannot reasonably be understood to prevent CCA from making efforts to fulfill its obligation to provide T.R. a FAPE. Because the grant of any CEA is rooted in a LEA's continuing obligation, it is inherently implied in any CEA that the LEA has the right to take reasonable measures to fulfill its legal duties to the student. Thus, whatever rights the Hearing Officer granted Plaintiff were intended to confer a benefit on her, enabling her to be kept abreast of her child's educational progress, and not intended to exclude any of CCA's efforts to comply with its legal obligations.

implemented and/or whether T.R. was receiving a FAPE, both of which CCA is legally responsible for ensuring.[15],[16]

The conclusion that CCA has the right and obligation to require progress reports informs the question of whether CCA failed to comply with or give effect to the Hearing Officer's decision. Because CCA had the legal right and obligation to require progress reports, this Court finds that CCA's doing so was not an impermissible demand on either Fusion or Plaintiff as a requirement

---

[15] As the United States Court of Appeals for the Third Circuit ("Third Circuit") noted in *Ferren C.*, a LEA should simply comply with the ongoing requirements of the IDEA if it wishes to minimize additional litigation over the adequacy of the CEA. 612 F.3d at 720. After already having been found to have violated the IDEA and denied T.R. a FAPE in the past, CCA appropriately took steps to attempt to avoid additional IDEA violations and subject both itself and T.R. to future litigation about the adequacy of the CEA and its implementation.

[16] In instances such as T.R.'s (described above, *supra* p. 12), parties often turn to liability waivers as a solution to address the uniquely challenging position in which such an arrangement places the LEA. *See, e.g.*, *Lauren W. v. DeFlaminis*, 480 F.3d 259, 269 (3d Cir. 2007) (explaining the need for an LEA to secure a waiver of rights under the IDEA before disbursing funds where parents unilaterally selected a full-time private placement: "[In circumstances where a student is placed in a private school pursuant to an IEP in bilateral agreement with the LEA, the LEA] would not need a waiver of rights or a waiver of related services in addition to those provided for in the IEP. In contrast, in [this student's] situation her parents unilaterally placed her in the non-approved private school, and because the [LEA's] supervision was inhibited and it could not guarantee the satisfaction of the conditions of a FAPE, the [LEA] sought to insulate itself from liability or further educational obligations by obtaining the waiver. Thus, the motivation for a request for a waiver . . . was entirely justified[.]"); *T.L. v. Pa. Leadership Charter Sch.*, 224 F. Supp. 3d 421, 427-28 (E.D. Pa. Dec. 12, 2016) (LEA and student entered contractual agreement that provided student with over one thousand hours of compensatory services (the agreed-upon equivalent of CEA) (defined broadly as special education, tutoring, other academic supports, and counseling) and allowed student to "choose whatever mixture of expensive and inexpensive services that [she] prefers" in exchange for a waiver of all IDEA claims against the LEA).

In such cases, the LEAs relinquish control over the student's placement and services—handing it over to the family—once the family has agreed not to hold the LEA legally responsible for whatever decisions the family may make over which the LEA would effectively have no control or ability to monitor. Without such a waiver, a parent cannot attempt to restrict the LEA's ability to monitor the child, nor the reasonable methods by which the LEA seeks to do so. To hold otherwise would be to impose legal liability on the LEA for another party's decisions and conduct, while also denying the LEA reasonable access to information necessary to satisfy its legal duties.

Notably, in this case, nothing prevented Plaintiff from withdrawing T.R. from CCA while his CEA was used to pay for full-time enrollment at Fusion, and Fusion becoming T.R.'s LEA. Had Plaintiff chosen this course of action, CCA would no longer bear the legal responsibility for T.R.'s FAPE, and CCA would not have required the same extent of information to disburse funds.

for tuition payment or the disbursement of the CEA funds. CCA was justified, as a matter of law, in requiring progress reports before committing to disburse CEA funds. The allegations in the complaint and attached documentation confirm that CCA reached out to Fusion to request the relevant information within a week of Plaintiff notifying CCA that she had selected Fusion as the provider, and immediately communicated that once the required information was received, Fusion could begin billing CCA.[17] This immediate, appropriately contingent offer to pay Fusion was followed by multiple reaffirmations by CCA of its commitment to pay for services rendered under the appropriate circumstances. Plaintiff does not allege that CCA, at any time, refused to pay for T.R.'s tuition for any reason other than requiring the progress reports. Based on these allegations, this Court concludes that CCA fulfilled its obligations under the Hearing Officer's decision and Order, and agreed to pay for T.R.'s tuition, conditioned upon it receiving relevant information and a commitment to provide continued progress reports necessary to CCA's fulfillment of its legal obligations to T.R. Therefore, since the facts alleged in Plaintiff's complaint indicate that CCA complied with the Hearing Officer's decision and Order, Count One of the complaint seeking enforcement of the Hearing Officer's decision and Order fails to state a claim upon which relief can be granted. Accordingly, this claim is dismissed.

### *Count II: Section 504 Retaliation*

CCA also argues that Plaintiff's complaint at Count II fails to state a § 504 retaliation claim. Specifically, CCA argues that any action it took was in pursuit of fulfilling its legal obligations to T.R., and that the allegations in the complaint and attached exhibits indicate that (1) CCA did not

---

[17] *See Stapleton*, 2017 U.S. Dist. LEXIS 204143 at *25-26 (holding that an LEA was entitled to "engage[] in a process to ascertain whether the requested compensatory education funds comported with the Hearing Officer's directive that such funds would be used for education services designed to further the goals of the Student's current or future IEP" where, "[r]ather than refusing the request outright, the [LEA] engaged Plaintiffs in several months of communications, requesting more information linking the [requested costs and services] to the goals of the Student's previous IEP.").

14

intimidate Fusion, as CCA and Fusion were in early agreement regarding T.R.'s attending Fusion, (2) CCA did not create any uncertainty for Plaintiff or T.R., as CCA cooperated with Fusion to ensure Fusion was a proper placement and made a clear commitment to pay for T.R.'s services, and (3) CCA's conduct was not intended to deter Plaintiff from utilizing the CEA. In her response, Plaintiff does not directly address CCA's arguments regarding this claim; instead, she makes a general statement that her entire complaint states claims upon which relief can be granted.

Section 504 of the Rehabilitation Act provides that no qualified, disabled individual can "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance" because of his or her disability. 29 U.S.C. § 794(a). Under the anti-retaliation provision that applies to the Rehabilitation Act, "[n]o recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purposes of interfering with any right or privilege secured by [the Rehabilitation Act], or because he [or she] has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing . . . ." *See* 34 C.F.R. § 100.7(e). Thus, "Section 504 of the Rehabilitation Act provides a private cause of action against those who retaliate against qualified individuals for asserting rights secured by the IDEA." *Stapleton*, 2017 U.S. Dist. LEXIS 204143 at *22. To assert a § 504 retaliation claim, a plaintiff must allege facts sufficient to show that: (1) the plaintiff engaged in a protected activity; (2) the LEA engaged in a retaliatory action sufficient to deter a person of ordinary firmness from exercising his or her rights; and (3) a causal connection between the protected activity and the retaliatory action. *Stapleton*, 2017 U.S. Dist. LEXIS 204143 at *22-23 (citing *Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

In the complaint, Plaintiff alleges that she engaged in the following protected activities: (1) filing due process complaints; (2) participating in due process hearings; and (3) identifying and securing Fusion as a third-party provider pursuant to the Hearing Officer's decision from those hearings. Plaintiff further alleges that CCA retaliated against her by, generally, requiring Fusion to send progress reports in exchange for funding and, specifically: (1) refusing to respond to Plaintiff's e-mails; (2) responding to Plaintiff's e-mails in a way that "ensures [Plaintiff] will not receive the message[;]" (3) refusing to provide information requested by Fusion; and (4) providing false and/or misleading information to Plaintiff and Fusion. As detailed above, CCA essentially argues that Plaintiff's complaint fails to allege facts that either directly show, or support an inference, that CCA engaged in any retaliatory actions (in response to either Plaintiff having engaged in the due process procedures that led to the Hearing Officer's decision or her selection of Fusion as a provider) sufficient to deter a person of ordinary firmness from exercising his or her rights under the IDEA.

A careful review of the complaint and attached exhibits validates Defendant's argument. Plaintiff's retaliation claim is premised on the theory that CCA acted in a retaliatory manner by communicating with Plaintiff and Fusion in a manner that allegedly created confusion and uncertainty regarding the implementation of the CEA. Compl. at p. 44 (ECF 2). This contention is very similar to the alleged retaliatory conduct in *Stapleton*. There, the plaintiffs contended that the LEA was "engaging [p]laintiffs in protracted communications regarding their demand for the release of the [CEA] funds that ultimately culminated in the refusal to release [CEA] funds for the purposes advocated by the [p]laintiffs." 2017 U.S. Dist. LEXIS 204143 at *24. The *Stapleton* court found that the LEA "was justified in its ultimate refusal to comply with Plaintiffs' request for the disbursement of compensatory education funds" and, therefore, "no reasonable juror could

16

conclude . . . that the [LEA] acted in a materially and objectively retaliatory manner by refusing to make available to Plaintiffs that to which Plaintiffs were not entitled." *Id.* at 24-25.

Here, this Court has found that CCA was justified, as a matter of law, in its attempts to gather information from Plaintiff and Fusion, and in its requests for attendance and progress reports from Fusion.[18] Therefore, this Court similarly finds that no person of ordinary firmness could conceivably be deterred from exercising his or her rights under the IDEA because CCA refused to make funds available to Plaintiff *that she was not actually entitled to* in the manner that she requested (*i.e.*, without CCA getting progress reports). CCA's conduct cannot be deemed retaliatory when this Court has found that CCA's conduct to be legally permissible. Thus, it is not retaliation to do what an entity has the legal obligation to do.

Further, the alleged facts do not support any inference that CCA's "engagement in a process to ascertain whether the requested [CEA] funds comported with the Hearing Officer's directive . . . amounted to a material and objective adverse course of action sufficient to deter an individual of ordinary fitness from vindicating his or her IDEA rights, as required to state a prima facie case of retaliation." *Stapleton*, 2017 U.S. Dist. LEXIS 204143 at *25. In fact, the allegations in the complaint indicate that CCA engaged with Plaintiff in an on-going dialogue regarding her request for CEA funds. The allegations further indicate that CCA went beyond the actual requirements of the Order and agreed to use CEA funds to pay for meals and transportation to facilitate T.R.'s attendance at Fusion. Such conduct supports an inference of good faith, if anything, and certainly not of retaliation.

---

[18] Additionally, the complaint and attached exhibits indicate that—contrary to Plaintiff's contentions—(1) CCA did respond to Plaintiff's e-mails and (2) CCA and Fusion agreed early-on about the arrangements for T.R. to attend Fusion, and contained no indication that (3) CCA refused to communicate with Fusion or that (4) CCA provided false or misleading information to Plaintiff or Fusion.

Finally, as aptly explained by the Third Circuit in *Lauren W.*, a plaintiff's argument that a LEA engaged in retaliation by refusing to fund a private placement without, for example, a waiver of rights or the ability to monitor the student's progress, "amounts to nothing more than an assertion that a party to a controversy that resists demands against it is engaging in retaliatory conduct by doing so. If [courts] permitted a trier of the facts to accept [the plaintiff's] view [courts] would allow [the trier of fact] to conclude that when parties are in a dispute and are discussing its resolution, one side, in advancing its position is negotiating, and the other is retaliating." *Lauren W.*, 480 F.3d at 269.

As the facts alleged in the complaint are insufficient to show that CCA engaged in any retaliatory action sufficient to deter a person of ordinary firmness from exercising his or her rights, Plaintiff's § 504 retaliation claim fails to state a claim on which relief can be granted. Accordingly, this claim is dismissed.

**CONCLUSION**

For the reasons stated herein, CCA's motion to dismiss is granted and all of Plaintiff's claims against CCA are dismissed. An Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO,* U.S.D.C. J.